See also, 976 F.Supp.2d 471, 2013 WL 433537.

**In the Matter of Gregory N. FILOSA, Respondent.**

**No. M–2–238.**

United States District Court, S.D. New York.

Feb. 5, 2013.

---

**181.**  *Gonzalez–Ramirez,* 561 F.3d at 31 (Merritt, J., concurring).

## OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge.

### BEFORE THE COMMITTEE ON GRIEVANCES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK [1]

This matter comes before the Committee on Grievances for the United States District Court for the Southern District of New York (the "Committee") to consider the imposition of discipline upon Respondent Gregory N. Filosa, a member of the bar of this Court, based on his conduct before the Honorable William H. Pauley, III, United States District Judge, in *Fryer v. Omnicom Media Group*, 09 Civ. 9514(WHP). In *Fryer*, Judge Pauley imposed a $15,000 sanction on the law firm Thompson Wigdor & Gilly and a $2,500 sanction on its client, plaintiff Violet Fryer, based on false testimony by Fryer at her deposition and efforts by Respondent and Scott B. Gilly to conceal Fryer's new employment and to leverage a false expert report in order to extract a favorable settlement.

For the reasons set forth below, the Committee finds that Respondent engaged in conduct that violates Rules 3.3 (conduct before a tribunal); 3.4 (fairness to opposing party and counsel); 4.1 (truthfulness in statements to others); and 8.4 (misconduct) of the New York Rules of Professional Conduct.

---

1. The members of the Committee are District Judge P. Kevin Castel, Chair; Chief Judge Loretta A. Preska; District Judges Vincent L. Briccetti, Katherine B. Forrest, Paul G. Gardephe, John F. Keenan, Colleen McMahon, Louis L. Stanton; and Richard J. Sullivan; and Magistrate Judge Frank Maas. Judge Castel is recused from this matter.

## BACKGROUND

In June of 2009, plaintiff Violet Fryer retained the law firm of Thompson Wigdor & Gilly ("TWG") to represent her in the prosecution of her employment discrimination claim against OMD (a subsidiary of Omnicom Media Group). Fryer alleged that, while she was employed at OMD, she was subjected to employment discrimination and retaliatory termination, in violation of the Family Medical Leave Act ("FMLA") and Title VII of the Civil Rights Act of 1964.

Respondent was assigned as the associate on the *Fryer* litigation in June of 2009, and remained the associate on the matter until the end of his employment with TWG. Respondent worked on the case under the supervision of partner Andrew Goodstadt until Goodstadt left the firm in August 2010. Thereafter, Respondent was supervised by partner Scott B. Gilly.

### The Expert Report and Settlement Negotiations

In July of 2010, TWG retained an economist to prepare a calculation of Fryer's potential damages resulting from the termination of her employment, and provided him with the information necessary to make that calculation. Fryer had remained unemployed since her termination from OMD. The economist prepared an expert report that contained a damages analysis based, in part, on the assumption that Fryer would remain unemployed through the end of 2010 and also calculated future earnings for a period of one to six years into the future.

Prior to service of the expert report, however, Fryer received, and accepted, two job offers. On September 10, 2010, she received an offer of employment from Universal McCann ("UM"), which she initially accepted. She then withdrew her acceptance of the UM offer when she received and accepted a job offer from Kraft Foods ("Kraft") on September 17, 2010 at a salary greater than what she had been paid by OMD. Fryer was scheduled to begin her employment with Kraft on October 11, 2010. Fryer advised Respondent of the foregoing on the date she received each offer, September 10th and September 17th, respectively. On September 10th, Respondent and Gilly discussed the fact that Fryer had received a job offer at a higher salary than she had earned at OMD, and that it was likely she would accept the offer. Respondent and Gilly also discussed the desirability of settling the case as soon as possible. On September 17th, Respondent advised Gilly that Fryer had decided to accept a job offer and had authorized him to renew settlement discussions with OMD.

The expert report was provided to TWG on September 22, 2010. On September 24, 2010, Respondent forwarded the report to Gilly in an email, stating:

> I received the economic damages report in Fryer. A copy is attached. We have to provide to opposing counsel by next Wednesday, but I wanted to discuss with you how we could leverage this into trying to settle it before they know about her new job. I will come by Monday to discuss, but I wanted to give you a heads up.

Gilly responded, "[s]ounds good. I just read the report and have some ideas." Following further discussions with Gilly, Respondent served the expert report upon defendants' counsel on September 27, 2010.

On September 28, 2010, Respondent engaged in a settlement discussion with opposing counsel. Respondent renewed the settlement demand of $350,000 that had originally been made during the parties' Rule 26(f) conference. In this discussion and in subsequent correspondence, Re-

spondent referenced the expert report to support the reasonableness of the settlement demand. Respondent had discussed this settlement strategy with Gilly. On September 29, 2010, Respondent sent opposing counsel a settlement demand letter, dated September 28, 2010, summarizing the previous settlement discussion, and noting that the renewed settlement offer of $350,000 was "at the bottom end of the range [of economic damages] provided in the expert report which we recently forwarded to you." Gilly reviewed and revised the September 28th letter before it was sent. There were no further settlement discussions until after the first day of Fryer's deposition.

### Deposition and Continued Settlement Negotiations

On October 7, 2010, Fryer was deposed by OMD. Respondent represented Fryer at the deposition. Counsel for OMD asked Fryer about her efforts to retain new employment. Specifically, he asked Fryer whether she had worked since she left OMD, to which Fryer replied "no." (Fryer Oct. 7, 2010 Dep. Transcript at 249:11–12.) Counsel for OMD then inquired what Fryer "had done in the past 60 days to find work." (*Id.* at 253:4–5.) Fryer responded that she had "been on interviews," had submitted her resume to various job boards as well as directly to specific companies' websites, and had "been working with several headhunters." (*Id.* at 253:6–9.) In response to further questioning from counsel for OMD, Fryer gave the names of two specific headhunters she had been communicating with, and lamented that the positions the headhunters presented to her always required "a different type of background than me, than I have, or it's again too senior or junior." (*Id.* at 253:15–255:11.) Counsel for OMD asked Fryer about how many interviews she had been on and with what companies. (*Id.* at

255:12–13, 15, 18.) Fryer stated that she "probably met with ten companies," specifically "MRI, MTV, Source Marketing, ... Mediacom, Universal McCann, Kraft," and the "CafeMom web site." (*Id.* at 255:16–17, 19–21.) When asked if she had second interviews with any companies, Fryer responded as follows: "With a few of them. And after I—I didn't—either I didn't hear back or I didn't get the job." (*Id.* at 256:18–20.) When asked about the "emotional impact" of the loss of her job, Fryer cited the "financial stress of everything, not knowing when is the next job going to come along," commenting that "[i]t's frustrating to keep trying and not getting anywhere." (*Id.* at 266:12–16.) Respondent was aware at the time of the deposition that Fryer had in fact accepted and then rejected a job offer from UM, and that she was scheduled to begin working at Kraft on October 11, 2010. Yet, at no time before, during or immediately following the October 7, 2010 deposition did Respondent disclose these facts to OMD or take any other steps to clarify the record.

Following the October 7, 2010 deposition, the parties engaged in several settlement discussions, but were unable to come to an agreement. Beginning on October 12, 2010, OMD had begun making offers to settle the case. Respondent reduced Fryer's settlement demand from $350,000 to $250,000. OMD eventually offered $125,000, to which Respondent replied that Fryer's final demand remained $250,000. Settlement discussions reached an impasse at this point.

### Documents

On April 20, 2010, OMD requested production of, among other things, all documents concerning: (a) Fryer's efforts to mitigate her damages; (b) Fryer's efforts to secure employment following the termination of her employment with OMD; (c)

each job that Fryer held since the termination of her employment with OMD; and (d) income that Fryer received from any such job. Fryer initially produced documents responsive to OMD's document requests, and Fryer supplemented her document production on September 7, 2010, October 5, 2010 and October 12, 2010. Yet, prior to November 11, 2010, Fryer had not produced any documents reflecting that she had received or accepted job offers from Kraft and/or UM. Among those documents that were not produced or logged on a privilege log is a series of e-mails between Fryer and Respondent, sent and received on September 17, 2010, and between Fryer and a representative of UM, forwarded to Respondent on September 20, 2010, that refer to Fryer's interviews and job offers from both UM and Kraft.

On October 4, 2010, Respondent consulted with Gilly regarding discovery strategy. More than two weeks later, on October 19, 2010, Respondent met with Gilly to discuss the impasse in settlement discussions and the status of discovery. Thus, Gilly was aware that Respondent had not yet supplemented Fryer's document production with correspondence concerning her job offer, and that he had not amended the expert report, despite the fact that Fryer had commenced employment with Kraft one week earlier.

*OMD's Discovery of Fryer's New Job*

On October 27, 2010, counsel for OMD contacted Respondent and notified him that he had learned that Fryer had in fact obtained a new job. Respondent confirmed that Fryer had obtained new employment. By letter dated November 16, 2010, counsel for OMD notified Respondent that OMD intended to seek dismissal and sanctions based on Fryer's misconduct, and asked Respondent to confirm that neither he nor anyone else at TWG was aware of Fryer's job offers, or her acceptance of the job with Kraft, prior to October 27, 2010 when counsel for OMD confronted Respondent. By letter dated November 24, 2010, Respondent denied OMD's allegations of misconduct and indicated that Fryer would seek sanctions if counsel for OMD pursued its "frivolous" motion for dismissal. On December 2, 2010, Respondent served OMD with a revised expert report, which capped Fryer's economic damages at $151,239 based, in part, on the fact that she had accepted the job with Kraft.

*The Sanctions Hearing*

By letter dated December 22, 2010, counsel for OMD advised Judge Pauley of Fryer's misconduct and requested a pre-motion conference on OMD's motion for dismissal and sanctions against Respondent, Gilly, TWG and Fryer. By letter dated December 30, 2010, Respondent denied any misconduct by either Fryer or her counsel and requested that Judge Pauley deny OMD's request for a pre-motion conference. The pre-motion conference was held on January 14, 2011. On March 11, 2011, counsel for OMD re-deposed Fryer. On April 6, 2011, counsel for OMD filed a motion for sanctions and dismissal. On May 20, 2011, Judge Pauley heard oral argument on OMD's motion. Though Gilly and founding partner Kenneth W. Thompson were present at the hearing, Respondent was not. At the conclusion of the oral argument, at which Thompson, Gilly, and counsel for OMD were heard, Judge Pauley issued an Order imposing a sanction of $2,500 against Fryer and $15,000 against TWG, but declined to dismiss Fryer's case.

### DISCUSSION

■ Rule 1.5(b)(5) of the Local Rules of the United States District Court for the Southern District of New York authorizes

the Committee on Grievances to discipline an attorney if, after notice and opportunity to respond, it is found by clear and convincing evidence that, "[i]n connection with activities in this Court, any attorney is found to have engaged in conduct violative of the New York State Rules of Professional Conduct as adopted from time to time by the Appellate Divisions of the State of New York. In interpreting the Code, in the absence of binding authority from the United States Supreme Court or the United States Court of Appeals for the Second Circuit, this Court, in the interests of comity and predictability, will give due regard to decisions of the New York Court of Appeals and other New York State courts, absent significant federal interests."

**I. Respondent violated Rules 3.3(a)(3), 3.4(a)(4) and 4.1 by serving an expert report that he knew was misleading and subsequently referring to the report in the context of settlement negotiations.**

■ The Committee finds that there is clear and convincing evidence that Respondent violated New York Rules of Professional Conduct ("Rules") 3.3(a)(3), 3.4(a)(4), and 4.1 when he served the expert report on OMD and then subsequently referenced the expert report to support the reasonableness of his client's settlement demand. Rules 3.3(a)(3) and 3.4(a)(4) provide that a lawyer shall not knowingly use false evidence. Rule 4.1 provides that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person." The New York State Bar Association ("NYBA") commentary to Rule 4.1 notes that "[a] misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading state-

ments or omissions that are the equivalent of affirmative false statements."

The expert report, estimating Fryer's economic damages as between $350,000 and $1 million, "was based, in part, on the assumption that plaintiff Violet Fryer would remain unemployed through the end of the 2010 calendar year and also calculated future lost earnings for a period of one to six years into the future." Verified Answer of Gregory N. Filosa to Order to Show Cause by Committee on Grievances ("Answer to OTSC") at 6–7. It is undisputed that Respondent knew the report was inaccurate, because he was admittedly aware that Fryer had accepted a higher-paying position with Kraft on September 17, 2010 and that she was scheduled to begin her employment with Kraft on October 11, 2010. *Id.* at 7 and 19. Yet, Respondent failed to advise opposing counsel that one of the key assumptions in the expert report was no longer valid, or would become invalid in the near future. *Id.* at 3. Instead, Respondent reaffirmed the expert report's misrepresentations when he referenced the report to support the reasonableness of Fryer's settlement demand. Respondent admits that "he erred in sending the expert report to OMD's lawyers because it was based on an assumption which was no longer supportable," and that he "was mistaken in engaging in settlement negotiations based upon the expert report." *Id.* at 19.

While it is true that a certain amount of posturing or puffing is not unheard of in settlement negotiations, Respondent's misrepresentations were not limited to the context of settlement discussions. Moreover, Respondent's reliance on the expert report cannot fairly be characterized as mere puffery about the value of his client's case—the entire report of economic damages was based on an invalid assumption of facts.

Respondent insists that he did not violate the Rules because he "relied on Mr. Gilly's reasonable resolution of arguable questions of their professional duties." *Id.* at 17–18. Respondent asserts that, shortly after he served the expert report, Gilly suggested that Respondent contact opposing counsel to attempt to discuss a possible settlement of the *Fryer* litigation. *Id.* at 8. Respondent admits that he "did not argue with Mr. Gilly, nor did he urge Mr. Gilly to disclose Ms. Fryer's new job at that time. In fact, Respondent's own email discussed 'how we could leverage [the expert report] into trying to settle it before they know about her new job.'" *Id.*

Under Rule 5.2(a), "[a] lawyer is bound by the[ ] Rules notwithstanding that the lawyer acted at the direction of another person." Rule 5.2(b) provides a narrow exception, recognizing that "[a] subordinate lawyer does not violate these Rules if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty." Rule 5.2(b) does not apply here. Even assuming that Respondent was just following orders handed down by Gilly, it cannot be said that Gilly's resolution of these questions—namely, whether to serve the misleading expert report, whether to inform opposing counsel of the invalid assumptions contained therein, and whether to rely on the expert report in the course of settlement negotiations—were even remotely reasonable. This is not an unsettled area of the law. Rules 3.3(a)(3), 3.4(a)(4), and 4.1 squarely address the question of whether a lawyer can use false evidence. Any question about the definition of "false" is quickly resolved by consulting the NYBA comments to Rule 4.1, which make clear that misleading statements or omissions fall within the purview of the Rule. Put simply, Gilly's chosen course of action with respect to the expert report was patently unreasonable, and

there is no plausible reading of the Rules or any other controlling authority that could suggest otherwise. Respondent admits as much in his Answer. *Id.* at 3–4 ("Mr. Filosa believed at that time (but no longer) that his supervisor had offered a reasonable resolution of an 'arguable question of professional duty,' . . .").

Furthermore, the NYBA commentary to Rule 5.2 states, "[t]o evaluate the supervisor's conclusion that the question is arguable and the supervisor's resolution of it is reasonable in light of applicable law, it is advisable that the subordinate lawyer undertake research, consult with a designated senior partner or special committee, if any . . ., or use other appropriate means." Respondent admits that he took no such steps to evaluate Gilly's proposed course of action with regards to the expert report. Answer to OTSC at 8–9. The fact that Respondent simply did not realize at the time that his actions were unethical does not insulate him from a finding that he violated the Rules. *See* Roy D. Simon, *Simon's Rules of Professional Conduct* 893 (2012) (discussing Rule 5.2(b): "This defense will not work if the actions of the subordinate attorney were plainly unethical . . . but the subordinate simply did not realize it."). Accordingly, the Committee has little difficulty concluding that Respondent violated Rules 3.3(a)(3), 3.4(a)(4), and 4.1 by serving, and subsequently using, the misleading expert report.

## II. Respondent violated Rules 3.3(a)(3) and 3.4(a)(4) by failing to correct deposition testimony provided by his client that Respondent knew was false.

■ There is also clear and convincing evidence that Respondent violated Rules 3.3(a)(3) and 3.4(a)(4) when he failed to correct false testimony offered by Fryer at her October 7, 2010 deposition. Respon-

dent now admits that Fryer's testimony was "evasive, if not outright false" and that it "misled opposing counsel regarding whether or not she had secured new employment." Answer to OTSC at 3; *see also, id.* at 26 (Respondent "recognizes that Ms. Fryer's testimony had the effect of misleading Mr. Cohen in his examination of Ms. Fryer during the first day of her deposition.") Though the Rules themselves are silent as to what remedial measures a lawyer should take to remedy false testimony by a client, Professor Simon, in *Simon's Rules of Professional Conduct*, suggests three steps: (i) "call upon the client to correct the false testimony;" (ii) "move to withdraw;" and (iii) make "some form of 'disclosure to the tribunal.' " *Id.* at 726–27. It is undisputed that Respondent "did not take any steps to immediately correct the record regarding Ms. Fryer's testimony." Respondent's Memorandum of Law in Response to the Committee on Grievances' Supplemental Order to Show Cause ("Answer to Supp. OTSC") at 3. Instead, he waited until almost three weeks after Fryer gave the false testimony and then asked Fryer to collect documents relating to her new job at Kraft, which Respondent claims he planned to produce to OMD at some unspecified time after Respondent commenced her employment. In the meantime, Respondent continued to engage in settlement negotiations with opposing counsel under obviously false pretenses. Answer to OTSC at 14. In fact, before Respondent ever produced a single document that would have revealed Fryer's new job, counsel for OMD revealed to Respondent that it had learned

about Fryer's new job from an independent source.

The fact that Fryer might not have intentionally committed perjury—which is hard to square with the facts in this matter—does not relieve Respondent of his professional obligation to correct the record. According to Ethics Opinion 741 by the New York County Lawyers' Association Committee on Professional Ethics, issued on March 1, 2010 ("Ethics Opinion 741"), an attorney faced with a client who has offered false testimony "should explore whether the client may be mistaken. If the client might be mistaken, the attorney should refresh the client's recollection, or demonstrate to the client that his testimony is not correct." [2] Although Fryer maintained that her testimony was accurate, she also claimed that she was confused and stressed during the deposition. Answer to OTSC at 26. There is no indication that Fryer was uncooperative in taking remedial action, or that she caused any delay in the process of remonstration. Under these circumstances, Respondent's failure to act quickly to clarify the record was clearly unreasonable.

Similarly, the document collection described by Respondent, though necessary to satisfy Fryer's ongoing obligation to supplement discovery under the Federal Rules of Civil Procedure, cannot fairly be characterized as a reasonable measure aimed at remedying Fryer's false testimony. For one thing, the documents—which Respondent describes as "documents relating to [Fryer's] new job" at Kraft—would not have corrected the false testimony regarding the UM offer. *Id.* at 13. More-

---

**2.** Respondent points out that Rule 3.3, which became effective on April 1, 2009, as well as Ethics Opinion 741, represented a significant change in the ethics requirements for New York lawyers, and he urges the Committee to take that into consideration when deciding. the charges against Respondent. The

changes to the law in this area are of little consequence here, however, since there is no indication in the record that Respondent gave *any* consideration to *any* authorities and ethics opinions, superseded or otherwise, when deciding on a course of conduct in this Action.

over, the documents provided after the first day of deposition would hardly have remedied the situation, since defendants would still have been deprived the opportunity to explore the details and timing of the job offers or Fryer's truthfulness given her initial responses. Respondent is quick to point out that at the end of the first day of Fryer's deposition, the defendants indicated that they had two more hours of questioning and they intended to continue the deposition on a second day, thus suggesting that defendants were not deprived the opportunity to explore these issues with Fryer; however, following the conclusion of the first day of Fryer's deposition, Respondent repeatedly took the position with the defendants that he had no intention of permitting Fryer to testify again on topics that had been covered on day one. *See* Supplemental Declaration of Guy R. Cohen, attached to Respondent's Answer as Exhibit F, at ¶ 5.

As for the timeliness of his efforts, Respondent himself admits that he "could have taken action to more promptly correct any misunderstanding created by Ms. Fryer's testimony during her October 7 deposition. Further, he could have supplemented Ms. Fryer's discovery responses more expeditiously." Answer to OTSC at 19. According to Ethics Opinion 741, "[w]hile there is no set time within which to remedy false testimony, it should be remedied before it is relied upon to another's detriment." Here, Respondent was well aware that OMD would likely rely on Fryer's misleading testimony not only throughout the remainder of the first day of her deposition and in preparation for the second day, but also in the course of settlement negotiations. Indeed, Respondent's own negotiation strategy was premised on the need to "leverage" that apparent misperception. Therefore, it was unreasonable for Respondent to do nothing for several weeks.

Again, Respondent raises Rule 5.2 as a defense to the charge that he failed to correct Fryer's false deposition testimony, claiming that he was acting at all times under the supervision of Gilly. However, there is no evidence that Respondent consulted with Gilly about the problems with Fryer's testimony, or that Gilly was even aware of the misleading testimony. Moreover, as set forth above, Respondent's obligation to correct Fryer's deposition testimony was not arguable, nor was his lack of prompt remedial action reasonable. Accordingly, the Committee concludes that Respondent clearly violated Rules 3.3(a)(3) and 3.4(a)(4) by failing to promptly correct Fryer's misleading deposition testimony.

## III. Respondent violated Rules 3.4(a)(1) and (3) by failing to timely produce documents that would have revealed Fryer's job offers.

■ There also is clear and convincing evidence that Respondent violated Rules 3.4(a)(1) and (3) by not promptly supplementing Fryer's document production with documents related to Fryer's job offers from UM and Kraft. Rule 3.4(a)(1) states that "[a] lawyer shall not . . . suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce." Similarly, under Rule 3.4(a)(3), "[a] lawyer shall not . . . conceal or knowingly fail to disclose that which the lawyer is required by law to reveal." Rule 26(e) of the Federal Rules of Civil Procedure imposed an obligation on Respondent to supplement Fryer's document production. Rule 26(e) states, "[a] party who has . . . responded to a request for production . . . must supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information

had not otherwise been made known to the other parties during the discovery process or in writing. . . ."

There is no dispute that the supplemental document production made by Fryer on November 11, 2010, more than 30 days after the first day of her deposition, was not made "in a timely manner." *See* Respondent Gregory N. Filosa's Response to the Committee on Grievances' Second Supplemental Order to Show Cause ("Answer to Second Supp. OTSC") at 9 ("Filosa does not dispute that this disclosure was belated."); *see also,* Answer to OTSC at 19 (Respondent admits that he "could have supplemented Ms. Fryer's discovery responses more expeditiously."). At the very least, Respondent should have produced the series of e-mails pertaining to the Kraft and UM job offers that were in Respondent's possession prior to the start of Fryer's deposition. Respondent insists that he acted in good faith, because he was waiting for Fryer to gather all of the documents relating to her employment before making a supplemental production. Yet, remarkably, Respondent did not take any action to obtain such documents from Fryer until October 26, 2010—19 days after the initial day of Fryer's deposition, and two weeks after she commenced employment with Kraft—even though Respondent had been aware of Fryer's job offers since mid-September.

Respondent also argues that he was not obligated to produce the aforementioned e-mails between Respondent and Fryer and between Fryer and the UM representative (which Fryer forwarded to Respondent) because they are exempt from discovery as falling within the attorney-client privilege.

*See* Answer to Second Supp. OTSC at 8–9. Even assuming the attorney-client privilege applied to the documents, the proper time for Respondent to assert the attorney-client privilege was *during* the discovery phase of the *Fryer* litigation, when his adversary could have challenged the assertion of privilege. Respondent failed to do that, and cannot now make the belated argument that the documents were properly withheld.

In sum, Respondent knew that the defendants had a misimpression about Fryer's employment status based on the inaccurate expert report, Fryer's misleading answers at her deposition, and Respondent's failure to supplement the responses to the defendants' discovery requests. This fact, along with Respondent's admitted strategy of trying to settle the case before the defendants found out about Fryer's new job, militate strongly against Respondent's present arguments that he had a good faith basis for withholding the documents.

## IV. Respondent engaged in misconduct in violation of Rules 8.4(a), (c), (d) and (h).

Clear and convincing evidence has established that Respondent engaged in intentionally deceptive misconduct that interfered with the administration of justice and reflects adversely on his fitness as a lawyer in violation of Rules 8.4(a), (c), (d) and (h).[3] There is no dispute that Respondent misled OMD about Fryer's employment prospects when he served the inaccurate expert report, failed to correct Fryer's evasive deposition testimony, and

---

**3.** Rule 8.4 states: "A lawyer or law firm shall not: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; . . . or (h) engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer."

failed to timely produce documents that would have revealed that Fryer had received two job offers and had, in fact, accepted both. Respondent then tried to quickly settle the case before the defendants caught on to the truth.

Respondent himself acknowledges that he failed to live up to his professional obligations and duties to the Court. *See* Answer to OTSC at 2 (Respondent "exercised poor professional judgment and did not live up to the standards of the profession or of this honorable Court."); *id.* (Respondent "now regretfully recognizes that he failed to conduct himself in accordance with the professional standards of this Court, notwithstanding the supervision of his superior, while engaging in the conduct that Judge Pauley found to be sanctionable."); *id.* at 17 (Respondent "acknowledges that his conduct fell short of the standard expected of attorneys practicing in this Court."); *id.* at 18 (Respondent acknowledges that "he was a relatively young and inexperienced attorney who exercised poor professional judgment and allowed his zeal for his client to overtake his duty to the profession and to the court."); *id.* at 28 (Respondent "conced[es] at this time that his conduct did not comply with the standards of the profession" and that "he is responsible for a lapse in professional judgment for which he is sincerely remorseful.")

Respondent offers in mitigation the fact that the time period between the filing of the expert report and "full disclosure to adversary counsel of Fryer's new job" was only 31 days. *See* Answer at 3; 14; 21. Yet, over the course of those 31 days, the plaintiff served her key expert report, the parties were engaged in active settlement negotiations, and the plaintiff sat for the first day of her deposition. Indeed, Respondent admits that he had multiple opportunities over the course of those 31 days to set the record straight. *See* Answer to OTSC at 20 (Fryer's new job should have been disclosed "in the expert report, in settlement negotiations, by correspondence, by Ms. Fryer in her deposition testimony, or by Mr. Filosa promptly thereafter.")

Respondent insists that, at all relevant times, he believed that the defendants would soon discover the truth through deposition questions. He points out that he "did not equivocate or prevaricate" on October 27, 2010 when opposing counsel asked him point-blank about Fryer's job at Kraft. Answer at 14. However, Respondent's belated honesty in the face of an adversary who had already discovered the truth is hardly worthy of applause. If opposing counsel had not discovered Fryer's employment on their own, there is no telling how much longer Respondent would have continued to conceal the truth or whether the parties would have reached a settlement premised on the concealed information. In any event, the fact that Respondent may not have planned to perpetuate his deceit indefinitely does not lessen the seriousness of his misconduct.

### CONCLUSION

■ The Committee on Grievances, having carefully considered Respondent's various submissions in response to the three Orders to Show Cause that were issued in this matter, finds that Respondent has raised no issues requiring a hearing. *See* S.D.N.Y. Local Civil Rule 1.5(d)(4). On the basis of Respondent's own admissions, the Committee finds that he acted in violation of Rules 3.3(a)(3) (knowingly used false evidence before a tribunal); 3.4(a)(1) (suppressed evidence); 3.4(a)(3) (failed to disclose that which he had a legal obligation to disclose); 3.4(a)(4) (knowingly used false evidence); 4.1 (made a false statement to a third person); 8.4(a) (en-

gaged in misconduct); 8.4(c) (engaged in conduct involving dishonesty, fraud, deceit or misrepresentation); 8.4(d) (engaged in conduct prejudicial to the administration of justice); and 8.4(h) (engaged in conduct that adversely reflects on his fitness as a lawyer). In determining the measure of discipline to be imposed upon Respondent, the Committee has taken into account, as mitigating circumstances, Respondent's relative youth, his expressions of remorse, the absence of a prior disciplinary record, and that, at least in some instances, he was acting at the specific direction of a supervising lawyer. The Committee has also taken into account the fact that Respondent has taken steps to better educate himself on the New York Rules of Professional Conduct.

Taking into consideration all of the circumstances indicated by the record, it is the Committee's opinion that suspension from the practice of law in this Court for a period of one year would be an appropriate and suitable discipline to be imposed upon Respondent. Accordingly, pursuant to S.D.N.Y. Local Civil Rule 1.5(b)(5) and (c)(1), Respondent is hereby suspended from the practice of law in the Southern District of New York for a period of one year, effective immediately, with leave to apply for reinstatement at the expiration of that term. The Clerk of this Court is hereby directed to unseal the entire record of this matter.

SO ORDERED.