**In the Matter of Scott B. GILLY, Respondent.**

No. M–2–238.

United States District Court, S.D. New York.

Feb. 5, 2013.

See also 976 F.Supp.2d 460, 2013 WL 433347.

## OPINION AND ORDER

**BEFORE THE COMMITTEE ON GRIEVANCES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**[1]

RICHARD J. SULLIVAN, District Judge.

This matter comes before the Committee on Grievances for the United States District Court for the Southern District of New York (the "Committee") to consider the imposition of discipline upon Respondent Scott B. Gilly, a member of the bar of this Court, based on his conduct before the Honorable William H. Pauley, III, United States District Judge, in *Fryer v. Omnicom Media Group*, 09 Civ. 9514(WHP). In *Fryer*, Judge Pauley imposed a $15,000 sanction on the law firm Thompson Wigdor & Gilly and a $2,500 sanction on its client, plaintiff Violet Fryer, based on false testimony by Fryer at her deposition and efforts by Respondent and Gregory N. Filosa to conceal Fryer's new employment and to leverage a false expert report in order to extract a favorable settlement.

For the reasons set forth below, the Committee finds that Respondent engaged in conduct that violates Rules 3.3 (conduct before a tribunal); 3.4 (fairness to opposing party and counsel); 4.1 (truthfulness in statements to others); 5.1 (responsibilities of law firms, partners, managers and supervisory lawyers); and 8.4 (misconduct) of the New York Rules of Professional Conduct.

## BACKGROUND

In June of 2009, plaintiff Violet Fryer retained the law firm of Thompson Wigdor & Gilly ("TWG") to represent her in the prosecution of her employment discrimination claim against OMD (a subsidiary of Omnicom Media Group). Fryer alleged that, while she was employed at OMD, she was subjected to employment discrimination and retaliatory termination, in violation of the Family Medical Leave Act ("FMLA") and Title VII of the Civil Rights Act of 1964.

---

1. The members of the Committee are District Judge P. Kevin Castel, Chair; Chief Judge Loretta A. Preska; District Judges Vincent L. Briccetti, Katherine B. Forrest, Paul G. Gardephe, John F. Keenan, Colleen McMahon, Louis L. Stanton, and Richard J. Sullivan; and Magistrate Judge Frank Maas. Judge Castel is recused from this matter.

At the outset, Andrew Goodstadt was the TWG partner assigned to the case and Gregory Filosa was the associate assigned to handle the day-to-day responsibilities in the case. When Goodstadt departed the firm in or around August 2010, Respondent assumed responsibility for the *Fryer* case and began supervising Filosa's work.

### The Expert Report and Settlement Negotiations

In July of 2010, TWG retained an economist to prepare a calculation of Fryer's potential damages resulting from the termination of her employment, and provided him with the information necessary to make that calculation. Fryer had remained unemployed since her termination from OMD. The economist prepared an expert report that contained a damages analysis based, in part, on the assumption that Fryer would remain unemployed through the end of 2010 and also calculated future earnings for a period of one to six years into the future.

Prior to service of the expert report, however, Fryer received, and accepted, two job offers. On September 10, 2010, she received an offer of employment from Universal McCann ("UM"), which she initially accepted. She then withdrew her acceptance of the UM offer when she received and accepted a job offer from Kraft Foods ("Kraft") on September 17, 2010 at a salary greater than what she had been paid by OMD. Fryer was scheduled to begin her employment with Kraft on October 11, 2010. Fryer advised Filosa of the foregoing on the date she received each offer, September 10th and September 17th, respectively. On September 10th, Filosa and Respondent discussed the fact that Fryer had received a job offer at a higher salary than she had earned at OMD, and that it was likely she would accept the offer. Filosa and Respondent also discussed the desirability of settling the case as soon as possible. On September 17th, Filosa advised Respondent that Fryer had decided to accept a job offer and had authorized him to renew settlement discussions with OMD.

The expert report was provided to TWG on September 22, 2010. On September 24, 2010, Filosa forwarded the report to Respondent in an email, stating:

> I received the economic damages report in Fryer. A copy is attached. We have to provide to opposing counsel by next Wednesday, but I wanted to discuss with you how we could leverage this into trying to settle it before they know about her new job. I will come by Monday to discuss, but I wanted to give you a heads up.

Respondent replied, "[s]ounds good. I just read the report and have some ideas." On September 27th, Respondent met with Filosa and instructed him to serve the expert report upon defendants' counsel and to serve an amended report once Fryer actually started her new job and began earning income that would mitigate her damages. Later that day, Filosa served the expert report on OMD's counsel.

During his conversation with Filosa on September 27th, Respondent observed the symmetry between Fryer's original settlement demand of $350,000 and the expert's low-end damages estimate of $354,952, and he suggested this reasoning to Filosa as an argument he could make during his settlement discussions with OMD's counsel. On September 28th, Filosa engaged in a settlement discussion with opposing counsel, in which he renewed the settlement demand of $350,000. In this discussion and in subsequent correspondence, Filosa referenced the expert report to support the reasonableness of the settlement demand. On September 29, 2010, Filosa sent opposing counsel a settlement demand letter,

dated September 28, 2010, summarizing the previous settlement discussion, and noting that the renewed settlement offer of $350,000 was "at the bottom end of the range [of economic damages] provided in the expert report which we recently forwarded to you." Respondent reviewed and revised the September 28th letter before it was sent. There were no further settlement discussions until after the first day of Fryer's deposition.

### Deposition and Continued Settlement Negotiations

On October 7, 2010, Fryer was deposed by OMD. Filosa represented Fryer at the deposition. Respondent had no involvement in prepping or defending Fryer with respect to her deposition. Counsel for OMD asked Fryer about her efforts to retain new employment. Specifically, he asked Fryer whether she had worked since she left OMD, to which Fryer replied "no." (Fryer Oct. 7, 2010 Dep. Transcript at 249:11–12.) Counsel for OMD then inquired what Fryer "had done in the past 60 days to find work." (*Id.* at 253:4–5.) Fryer responded that she had "been on interviews," had submitted her resume to various job boards as well as directly to specific companies' websites, and had "been working with several headhunters." (*Id.* at 253:6–9.) In response to further questioning, Fryer gave the names of two specific headhunters she had been communicating with, and lamented that the positions the headhunters presented to her always required "a different type of background than me, than I have, or it's again too senior or junior." (*Id.* at 253:15–255: 11.) Counsel for OMD asked Fryer about how many interviews she had been on and with what companies. (*Id.* at 255:12–13, 15, 18.) Fryer stated that she "probably met with ten companies," specifically "MRI, MTV, Source Marketing, ... Mediacom, Universal McCann, Kraft," and the "CafeMom web site." (*Id.* at 255:16–17, 19–21.) When asked if she had second interviews with any companies, Fryer responded as follows: "With a few of them. And after I—I didn't—either I didn't hear back or I didn't get the job." (*Id.* at 256:18–20.) When asked about the "emotional impact" of the loss of her job, Fryer cited the "financial stress of everything, not knowing when is the next job going to come along," commenting that "[i]t's frustrating to keep trying and not getting anywhere." (*Id.* at 266:12–16.) Filosa was aware at the time of the deposition that Fryer had in fact accepted and then rejected a job offer from UM, and that she had accepted a job with Kraft where she was scheduled to begin working on October 11, 2010. Yet, at no time before, during or immediately following the October 7, 2010 deposition did Filosa disclose these facts to OMD or take any other steps to clarify the record.

When Filosa returned to TWG's office after the deposition ended, he reported to Respondent that the deposition had gone fine, and that OMD's counsel failed to question Fryer about whether she had received any job offer since being terminated by OMD. Filosa explained that opposing counsel had ended the deposition early and likely planned to cover the issue of mitigation of damages during the second day of Fryer's deposition. Respondent did not become aware of the line of questioning concerning Fryer's job interviews until later in October 2010, when OMD's counsel alleged that Fryer had committed perjury.

Following the October 7, 2010 deposition, the parties engaged in several settlement discussions, but were unable to come to an agreement. Beginning on October 12, 2010, OMD had begun making offers to settle the case. Filosa reduced Fryer's settlement demand from $350,000 to $250,000. OMD eventually offered

$125,000, to which Filosa responded that Fryer's final demand remained $250,000. Settlement discussions reached an impasse at this point. Respondent had no involvement in or discussions with Filosa regarding any of these settlement discussions until October 19, 2010, when Filosa informed Respondent of the impasse.

*Documents*

As early as April 20, 2010, OMD had requested production of, among other things, all documents concerning: (a) Fryer's efforts to mitigate her damages; (b) Fryer's efforts to secure employment following the termination of her employment with OMD; (c) each job that Fryer held since the termination of her employment with OMD; and (d) income that Fryer received from any such job. Filosa initially produced documents responsive to OMD's document requests, and supplemented the document production on September 7, October 5, and October 12, 2010. Yet, none of those productions included a single document relating to Fryer's job offers from Kraft and/or UM. Among those documents that should have been timely produced (or logged on a privilege log) is a series of e-mails between Fryer and Filosa, sent and received on September 17, 2010, and between Fryer and a representative of UM, forwarded to Filosa on September 20, 2010, that refer to Fryer's interviews and job offers from both UM and Kraft.

On October 4, 2010, Filosa consulted with Respondent regarding supplementing the production in the case to provide certain documents referenced in the expert report as requested by OMD. Respondent asked Filosa if he had supplemented Fryer's discovery responses to disclose her job offer. Filosa responded that he was still gathering the necessary documents from Fryer to supplement her production. Respondent accepted Filosa's response, but reminded Filosa to amend the expert report promptly and to supplement Fryer's document production as soon as possible.

More than two weeks later, on October 19, 2010, Respondent met with Filosa and learned of the impasse in settlement discussions and the status of discovery. In this meeting, Respondent learned that Filosa still had not supplemented Fryer's document production with documents concerning her job offer, nor had he amended the expert report, despite the fact that Fryer had commenced employment with Kraft one week earlier. Filosa explained that Fryer was still in the process of gathering her complete job search materials and evidence of her income in her new position with Kraft. Filosa stated that he did not perceive any urgency in supplementing the discovery because the second day of Fryer's deposition had not yet been scheduled, and explained that he planned to supplement the production in advance of day two of Fryer's deposition. Respondent accepted Filosa's explanation and timeframe for production, and did not press him to act more quickly.

*OMD's Discovery of Fryer's New Job*

On October 27, 2010, counsel for OMD contacted Filosa and notified him that he had learned that Fryer had in fact obtained a new job. Filosa confirmed that Fryer had obtained new employment. By letter dated November 16, 2010, counsel for OMD notified Filosa that OMD intended to seek dismissal and sanctions based on Fryer's misconduct, and asked Filosa to confirm that neither he nor anyone else at TWG was aware of Fryer's job offers, or her acceptance of the job with Kraft, prior to October 27, 2010 when counsel for OMD confronted Filosa. By letter dated November 24, 2010, Filosa denied OMD's allegations of misconduct and indicated that Plaintiff would seek sanctions if counsel for

OMD pursued its "frivolous" motion for dismissal. On December 2, 2010, Filosa served OMD with a revised expert report, which capped Fryer's economic damages at $151,239 based, in part, on the fact that she had accepted the job with Kraft.

*The Sanctions Hearing and Respondents' Misstatements on the Record*

By letter dated December 22, 2010, counsel for OMD advised Judge Pauley of Fryer's misconduct and requested a pre-motion conference on OMD's motion for dismissal and sanctions against Respondent, Filosa, TWG and Fryer. By letter dated December 30, 2010, Respondent denied any misconduct by either Fryer or her counsel and requested that Judge Pauley deny OMD's request for a pre-motion conference. The pre-motion conference was held on January 14, 2011. On March 11, 2011, counsel for OMD re-deposed Fryer. On April 6, 2011, counsel for OMD filed a motion for sanctions and dismissal. On May 20, 2011, Judge Pauley heard oral argument on OMD's motion. Though Respondent and founding partner Kenneth W. Thompson were present at the hearing, Filosa was not. At the conclusion of the oral argument, at which Thompson, Gilly, and counsel for OMD were heard, Judge Pauley issued an Order imposing a sanction of $2,500 against Fryer and $15,000 against TWG, but declined to dismiss Fryer's case.

Respondent admits that he made two factual misstatements during the sanctions hearing, which he later corrected in a letter to Judge Pauley. First, he stated to the Court that: "My best recollection is I did not review the expert report until after Mr. Cohen [OMD's counsel] brought these issues to the attention of our firm in his initial letter to Mr. Filosa about this matter." (Transcript of May 20, 2011 Hearing on Motion to Dismiss and for Sanctions at 26.) Respondent claims that at the time he made that statement, he believed his statement to be true and that he had not reviewed the report prior to opposing counsel's November 16, 2010 letter. He claims that he had forgotten that he had briefly reviewed the expert report in September 2010 and had communicated with Filosa about the expert report at that time. He did not realize the statement was incorrect until he reviewed his September 24, 2010 email exchange with Filosa one week after the sanctions hearing, when the transcript of the sanctions hearing was published in the *New York Law Journal.*

Second, Respondent stated to the Court that: "I was not aware [that Mr. Filosa had not disclosed Fryer's job to defense counsel] until it was brought to our attention by [OMD's counsel]." (*Id.*) In fact, Respondent was aware that Filosa had not disclosed Fryer's job to OMD's counsel at the time Filosa served the expert report. Respondent claims that his incorrect statement resulted from his failure to state clearly what he intended to communicate in response to Judge Pauley's question. What he had intended to communicate was that he did not know the full extent of the non-disclosure alleged until it was set forth in OMD's correspondence. When Respondent later reviewed the transcript of the hearing, he realized that his response to the Court's question did not come out as intended and that it needed to be corrected. On May 31, 2011, Respondent wrote Judge Pauley to correct these statements. He self-reported himself to the Departmental Disciplinary Committee for the First Judicial Department. He also voluntarily withdrew from TWG.

### DISCUSSION

Rule 1.5(b)(5) of the Local Rules of the United States District Court for the Southern District of New York authorizes the

Committee on Grievances to discipline an attorney if, after notice and opportunity to respond, it is found by clear and convincing evidence that, "[i]n connection with activities in this Court, any attorney is found to have engaged in conduct violative of the New York State Rules of Professional Conduct as adopted from time to time by the Appellate Divisions of the State of New York. In interpreting the Code, in the absence of binding authority from the United States Supreme Court or the United States Court of Appeals for the Second Circuit, this Court, in the interests of comity and predictability, will give due regard to decisions of the New York Court of Appeals and other New York State courts, absent significant federal interests."

### I. Respondent violated Rules 3.3(a)(3); 3.4(a)(4); 4.1; and 5.1(b)(2) and (d)(1) by instructing Filosa to serve the misleading expert report and utilize it in the context of settlement negotiations.

█ The Committee finds that there is clear and convincing evidence that Respondent violated Rules 3.3(a)(3); 3.4(a)(4); 4.1; and 5.1(b)(2) and (d)(1) of the New York Rules of Professional Conduct ("Rules") when he instructed Filosa to serve the expert report on OMD and then suggested that Filosa reference the expert report to support the reasonableness of Fryer's settlement demand. Rule 5.1(b)(2) provides that "a lawyer with direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the supervised lawyer conforms to these Rules."

Rule 5.1(d)(1) states, "[a] lawyer shall be responsible for a violation of these Rules by another lawyer if the lawyer orders or directs the specific conduct, or, with knowledge of the specific conduct, ratifies it."

The actions Respondent directed Filosa to take with respect to the expert report clearly violated Rules 3.3(a)(3); 3.4(a)(4); and 4.1, which prohibit the use of false evidence.[2] *See In re Filosa,* No. M–2–238, Opinion and Order, 976 F.Supp.2d 460, 2013 WL 433347 (S.D.N.Y. Feb. 5, 2013). The expert report, estimating Fryer's economic damages as between $350,000 and $1 million, "was based on alternative assumptions that she would accrue economic damages for a period of between approximately 18 months and six years." Respondent's Declaration in Response to the July 15, 2011 Order to Show Cause ("Aug. 25, 2011 Declaration") at ¶ 44. Respondent and Filosa were admittedly aware that Fryer had already accepted new employment at the time they served the expert report and, therefore, knew that the report misrepresented Fryer's economic damages. Yet, neither Respondent nor Filosa advised opposing counsel that one of the key assumptions in the expert report was no longer valid, or would become invalid in the near future. Instead, Respondent told Filosa to reaffirm the misrepresentations by referencing the report to support the reasonableness of Fryer's settlement demand.

Respondent offers by way of excuse his belief that the expert report was not technically false at the time it was served because Fryer had not yet commenced her

---

**2.** Rules 3.3(a)(3) and 3.4(a)(4) provide that a lawyer shall not knowingly use false evidence. Rule 4.1 provides that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person." The New York State Bar Association ("NYBA") commentary to Rule 4.1 notes that "[a] misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements."

new employment. He also claims that he relied on Filosa's "commitment to promptly amend the report once Fryer started working and earning mitigating income." *Id.* at ¶ 48. Yet, Respondent took no interim steps to prepare a correction to the expert report so that it could be quickly amended once Fryer began her new job. Furthermore, once Fryer did start her new job, and the expert report indisputably became false, Respondent made no efforts to ensure that it was amended. Instead, he accepted Filosa's assurances that it would be corrected at some undetermined time before the second day of Fryer's deposition, which was yet to be scheduled. *See id.* at ¶ 59.

Respondent now admits that he exercised poor judgment, and that "the better way to have proceeded would have been to instruct Mr. Filosa not to serve the expert report at all in light of the strong probability that it would almost immediately become moot upon Ms. Fryer's reemployment." *Id.* This is an understatement that obscures the clear violation of the Rules that took place here.

## II. Respondent violated Rules 3.4(a)(1) and (3) and 5.1(b)(2) and (d)(1) by ratifying Filosa's failure to timely produce documents that would have revealed Fryer's job offers.

■ There is also clear and convincing evidence that Respondent violated Rules 3.4(a)(1) and (3) and 5.1(b)(2) and (d)(1) when he ratified Filosa's failure to timely produce documents requested by OMD that pertained to Fryer's job search efforts and new position with Kraft. Filosa's fail-

ure to produce the documents in a timely manner clearly violated Rules 3.4(a)(1) and (3), which prohibit a lawyer from withholding evidence.[3] *See In re Filosa*, No. M-2-238, Opinion and Order, 976 F.Supp.2d 460, 2013 WL 433347 (S.D.N.Y. Feb. 5, 2013). Under Rule 5.1(d)(1), by ratifying Filosa's conduct, Respondent became responsible for Filosa's violation of these Rules. In addition, Respondent's failure to ensure Filosa conformed to Rule 3.4 is itself a violation of Rule 5.1(b)(2).

There is, and can be, no dispute that the supplemental document production made by Fryer on November 11, 2010, more than 30 days after the first day of her deposition, was not made "in a timely manner." *See* Aug. 25 Declaration at 28, n. 11 ("I acknowledge that these documents should have been provided to OMD's counsel more promptly than happened here.") Respondent claims that he questioned Filosa about the document production on October 4th, and that Filosa told him he was still gathering the necessary documents from Fryer to supplement her production. Respondent states that he "perceived no harm in allowing Mr. Filosa to supplement the document production at his own pace," even though Respondent admits that his "own practice would be to have provided such supplemental production in advance of the [October 7th] deposition." Aug. 25, 2011 Declaration at ¶ 53. More than two weeks later, Respondent learned that Filosa still had not supplemented the production with documents pertaining to Fryer's job search efforts and new position with Kraft, despite the fact that Fryer had commenced employment with Kraft one week earlier. *Id.* at ¶ 59. Yet, remarkably, Respondent still

---

**3.** Rule 3.4(a)(1) states that "[a] lawyer shall not ... suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce." Similarly, under Rule 3.4(a)(3), "[a] lawyer shall not ... conceal or knowing-

ly fail to disclose that which the lawyer is required by law to reveal." Rule 26(e) of the Federal Rules of Civil Procedure imposed an obligation on Fryer to supplement her document production.

did not urge Filosa to press Fryer to provide the documents more quickly, nor did he follow up with Filosa to ensure that the production was supplemented shortly thereafter. Instead, Respondent ratified Filosa's misconduct by accepting his excuse that there was no rush because day two of Fryer's deposition had not yet been scheduled. Respondent's failure to press Filosa to supplement the production was unreasonable, particularly in light of the fact that Respondent knew that defendants had a misimpression of Fryer's employment status based on the misleading expert report and the failure to supplement the responses to defendants' discovery requests.

### III. Respondent engaged in misconduct in violation of Rules 8.4(a), (c), (d) and (h).

■ Clear and convincing evidence has established that Respondent engaged in intentionally deceptive misconduct that interfered with the administration of justice and reflects adversely on his fitness as a lawyer in violation of Rules 8.4(a), (c), (d) and (h).[4] There is no dispute that Respondent knowingly misled OMD about Fryer's employment prospects when he instructed Filosa to serve the inaccurate expert report. Respondent then encouraged Filosa to try to quickly settle the case, and allowed Filosa to withhold from production those documents that would have revealed the truth.

Respondent himself acknowledges that he failed to live up to his professional obligations and duties to the Court. *See* Aug. 25 Declaration at ¶ 87 ("[M]y conduct fell short of the best practices and high standards by which I have always conducted myself in my legal career.... I should have exercised better professional judgment in a number of regards.")

### *CONCLUSION*

■ The Committee on Grievances, having carefully considered Respondent's various submissions in response to the three Orders to Show Cause that were issued in this matter, finds that Respondent has raised no issues requiring a hearing. *See* S.D.N.Y. Local Civil Rule 1.5(d)(4). On the basis of Respondent's own admissions, the Committee finds that he acted in violation of Rules 3.3(a)(3) (knowingly used false evidence before a tribunal); 3.4(a)(1) (suppressed evidence); 3.4(a)(3) (failed to disclose that which he had a legal obligation to disclose); 3.4(a)(4) (knowingly used false evidence); 4.1 (made a false statement to a third person); 5.1(b)(2) (failed to make reasonable efforts to ensure that a supervised lawyer conformed to the Rules); 5.1(d)(1) (ordered, directed or ratified a violation of the Rules); 8.4(a) (engaged in misconduct); 8.4(c) (engaged in conduct involving dishonesty, fraud, deceit or misrepresentation); 8.4(d) (engaged in conduct prejudicial to the administration of justice); and 8.4(h) (engaged in conduct that adversely reflects on his fitness as a lawyer). In determining the measure of discipline to be imposed upon Respondent, the Committee has taken into account, as mitigating circumstances, Respondent's twenty years of service to the Bar, his self-reporting to Judge Pauley and the First Department Disciplinary Committee, his expressions of remorse, and the serious

---

4. Rule 8.4 states: "A lawyer or law firm shall not: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; ... (c) engage in conduct involving dishonesty, fraud, deceit or misrep-resentation; (d) engage in conduct that is prejudicial to the administration of justice; ... or (h) engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer."

impact that his misconduct has already had on his legal career.

Taking into consideration all of the circumstances indicated by the record, it is the Committee's opinion that suspension from the practice of law in this Court for a period of one year would be an appropriate and suitable discipline to be imposed upon Respondent. Accordingly, pursuant to S.D.N.Y. Local Civil Rule 1.5(b)(5) and (c)(1), Respondent is hereby suspended from the practice of law in the Southern District of New York for a period of one year, effective immediately, with leave to apply for reinstatement at the expiration of that term. The Clerk of this Court is hereby directed to unseal the entire record of this matter.

SO ORDERED.